**UNITED STATES of America,**
**Appellee,**

v.

**Irving B. KAHN and Teleprompter**
**Corporation, Appellants.**

**Nos. 119, 120, Docket Nos. 71–2205,**
**71–2206, 72–1776 and 72–1777.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 1972.

Decided Jan. 9, 1973.

---

Robert B. Fiske, Jr., New York City (Davis, Polk & Wardwell, Dale L. Matschullat, New York City, and Alan M. Dershowitz, Cambridge, Mass., of counsel), for appellant Teleprompter Corp.

John W. Nields, Asst. U. S. Atty. (Silvio J. Mollo, Acting U. S. Atty., S.D.N.Y., John D. Gordan, III, Asst. U.S. Atty., of counsel), for appellee.

Peter Fleming, Jr., New York City (Curtis, Mallet-Prevost, Colt & Mosle, New York City, John E. Sprizzo, Martin J. Proscia, and Philip Mandel, New York City, of counsel), for appellant Kahn.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This case takes us into the corrupt municipal politics of Johnstown, Pennsylvania, where local franchises were apparently granted to the highest bidder —of the biggest bribe to local officials. In 1966, Irving B. Kahn, on behalf of Teleprompter Corporation, made such a payment to three Johnstown officials to insure the retention of a local cable television franchise. The plot was later uncovered, and prosecution ensued. After a jury trial in the Southern District of New York, Constance Baker Motley, Judge, Kahn and Teleprompter were convicted of conspiracy and violation of the Travel Act, 18 U.S.C. § 1952; Kahn was also convicted of perjury arising out of related grand jury proceedings. A motion for new trial was denied, 340 F. Supp. 485. Aided by able counsel, both appellants have now launched massive appeals. Nonetheless, we find no error and affirm.

## I. THE FACTS

The background facts are not seriously in dispute. Appellants admit that the payment, totaling $15,000, was made to the three Johnstown officials, and that they paid the money to retain the TV franchise. In defense, they claim that the payment was the result of extortion, threats by the local politicians to destroy Teleprompter's valuable franchise.

The key characters to the drama can be quickly identified. Kahn was the president, founder, and chairman of the board of Teleprompter, which had operated a cable TV franchise in Johnstown since 1961. Kenneth O. Tompkins was the mayor of Johnstown; J. Howard Deardorff and Robert McKee were members of the City Council, who together with Tompkins, comprised a majority of that body.

Tompkins was elected in 1963, on a platform that included promises to increase local revenues from cable TV. In April, 1965, the City Council passed an ordinance, authorizing the granting of "non-exclusive licenses" for the operation of cable television franchises in return for payments to the city of about $12,000 a year. Teleprompter, which until then had been paying $600 annually for what to all intents and purposes was an exclusive license, became understandably upset, and initiated court action to void the ordinance as unconstitutional. Negotiations followed, and the parties apparently settled upon an arrangement that would require Teleprompter to make annual payments to the city, beginning at $7500 and increasing to $12,000, in return for an exclusive franchise. This agreement was submitted to the City Council on December 14, 1965, and set down for consideration at the next weekly meeting.

A vote on the Teleprompter agreement never came. On December 21, representatives of four companies appeared at the meeting, and offered to bid on the

TV franchise. On December 28, the representative of a fifth firm did likewise. At least two of the companies publicized their offers, which were on the surface considerably more generous than the proposed Teleprompter agreement.[1] On January 18, 1966, the Council announced that bids would be taken for the franchise, which would then be awarded at the February 1 meeting.

Kahn came quickly to Johnstown to fight the proposed bidding. On January 24, he met in his room at the Holiday Inn with Tompkins, Deardorff and McKee. According to Tompkins and Deardorff's trial testimony, Kahn originally tried to argue the three out of going through with the proposed bidding, but finally offered each a $5000 bribe if they would vote for Teleprompter on February 1. All agreed.

On the following day, Kahn appeared before the Council, and maintaining his previous public posture, argued strenuously against the proposed bidding. He spent several more days in Johnstown, continuing his public lobbying efforts.

Nevertheless, the bidding went forward. Teleprompter did not formally "bid", but did make an "offer" of $474,000 for a twenty-year exclusive franchise.[2] That bid was accepted by the Council on February 1, subject to further negotiations about specific conditions. Other bids were formally rejected on February 8; after intermediate negotiations between Teleprompter and the city, the franchise was finally awarded on March 2.

In the meantime, on February 26, Kenneth O. Tompkins II the mayor's son, went to New York City and picked up a $7500 check from Teleprompter's public relations firm. He deposited the check, installment number one of the bribe, in a New York bank, drew two

checks, and mailed them to his father, who distributed the proceeds. The next installment came in August, 1966, when the mayor himself went to New York, and collected $6000 from Teleprompter for a fictitious office machine that had allegedly been sold to the local TV franchise by Tompkins' office supply company. The same ploy was used to mask the final $1500 payment, in October, 1966, which was mailed directly to Tompkins' office.

On October 28, 1970, the younger Tompkins received a subpoena to testify before a grand jury in the Southern District. On November 6, he appeared, and falsely testified that the first $7500 check was in return for survey work he had done for Teleprompter. On November 25, the mayor appeared before the grand jury, and invoked the Fifth Amendment. Deardorff followed suit on December 16. On December 17, Kahn appeared for the first time and testified. He denied the payment of any bribes, and described the survey work allegedly done by the younger Tompkins.

In the next several weeks, the city officials apparently decided to make a clean breast of things. The mayor reappeared on December 22 and Deardorff on December 29, and both testified about the bribes. McKee again declined to testify on December 22, but on December 29 relented and also testified about the bribes. Finally, on January 27, Kahn reappeared, and read a prepared statement, admitting the payments but claiming that they were extorted.

Indictments followed, charging Kahn, Tompkins, Deardorff, McKee and Teleprompter with conspiracy and violation of the Travel Act, and charging Kahn with perjury. Tompkins and Deardorff pleaded guilty to conspiracy and testified for the government at the ensuing trials. McKee's case was severed,

1. Trans Video Company of Barnesboro, Pa., offered $421,620 over twenty years, and the Johnstown Traction Company offered $450,000 over twenty years or 4% of gross receipts, whichever was higher.

2. This stance was apparently taken to protect Teleprompter's litigation posture that the bidding procedure was unconstitutional.

and he was convicted[3] after a trial before Judge Motley subsequent to that of Kahn and Teleprompter. The conviction was affirmed here. United States v. McKee, 462 F.2d 275 (2d Cir. 1972).

## II. THE EXTORTION DEFENSE

As noted above, while admitting the $15,000 payments, Kahn and Teleprompter claimed that the money had been extorted from them. The factual outlines of the defense, presented chiefly through Kahn's grand jury testimony, were as follows. The January 24 meeting at the Holiday Inn was a wholly innocent one, devoted wholly to legitimate lobbying against the proposed bidding. Realizing the apparent futility of its lobbying efforts, Teleprompter decided to make an offer the Council couldn't refuse, and the $474,000 bid followed. The size of the bid caught the mayor and Council off guard, and they were forced to accept it. But this angered the corrupt officials, who had planned to award the franchise to another bidder. Thus, the officials took advantage of the time period after February 1, ostensibly devoted to detailed negotiations, to threaten withdrawal of Council approval unless Teleprompter agreed to a "payoff." These threats, which went to the very economic survival of Teleprompter in the cable TV line, finally overwhelmed Kahn on February 10, and he reluctantly succumbed to the nefarious scheme.

Since appellants fully presented this defense to the jury below, which through its verdict of guilty rejected it, our obligation to view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680

(1942), would ordinarily require us to do the same. But Kahn and Teleprompter claim that Judge Motley's instructions on the extortion defense prevented the jury from fairly considering the issue. It is to those contentions we now turn.

The Travel Act, 18 U.S.C. § 1952, makes it a crime to use an interstate facility with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," including bribery in violation of state law. Just as the initial inquiry in a Travel Act case is whether the underlying activity violates a state law, see United States v. Nardello, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), the assertion of a particular state law defense in such a case requires a determination of whether the relevant state recognizes the defense. United States v. D'Amato, 436 F.2d 52, 53 (3rd Cir. 1970).

In the case at hand, appellants claim that Judge Motley erred by not instructing the jury that the defendants should be acquitted if it were found that they paid the money in response to extortion, or put briefly, that proof of extortion was a complete defense to bribery. Instead, the trial court told the jury that extortionate conduct by the public officials, if proved, could be considered by them in connection with the issue of whether the defendants had the requisite criminal intent and willfulness to violate the law. Since the Travel Act counts here were premised on a violation of several Pennsylvania bribery statutes,[4] the relevant question is wheth-

---

3. McKee was acquitted with regard to one Travel Act count.

4. The Pennsylvania statutes which Kahn and Teleprompter were charged with violating were as follows:
 18 Pa.Stat. § 4303:
 "Whoever shall . . . give or make any promise or agreement for the payment . . . of any money . . . in order to obtain or influence the vote,

opinion, verdict, award, judgment, decree, or behavior of . . . any officer . . . of this Commonwealth, or of any political subdivision thereof . . . in any . . . matter or thing whatsoever, depending or which shall depend before him or them, is guilty of bribery."
18 Pa.Stat. § 4304:
 "Whoever . . . by offer or promise of money . . . endeavors to influ-

er Pennsylvania law recognizes extortion as a complete defense to bribery, or whether such a defense is relevant only on the issues of intent and willfulness.

Unfortunately, there are no Pennsylvania cases on point, and such dicta as exist are inconclusive.[5] Appellants admit this absence of state law, but rely heavily on United States v. Corallo, 413 F.2d 1306 (2d Cir.), cert. denied, 396 U. S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969), where this Court held "wholly unexceptionable" jury instructions which characterized extortion as a complete defense to bribery. *Id.* at 1323. However, the *Corallo* Travel Act prosecution was premised on an underlying violation of New York law, and New York Penal Law § 200.05 (McKinney 1967) explicitly makes proof of extortion a complete defense to bribery. The Pennsylvania bribery statutes contain no such provision, and we think it would be anomalous to read into the Pennsylvania code a provision that the New York legislature thought required a separate and explicit section in its state law.

At least two other considerations support this conclusion. In federal prosecutions under 18 U.S.C. § 201, this court has refused to follow the New York rule of calling extortion a complete defense to bribery, but has instead held that such proof is relevant as bearing on the issue of intent. United States v. Barash, 365 F.2d 395 (2d Cir. 1966) (*Barash I*). There appears no reason to reach a different result with respect to Pennsylvania law, which, like § 201, is conspicuously silent on the subject.

Finally, as a policy matter, we think that the *Barash I* rule is the preferable one. Almost every bribery case involves at least some coercion by the public official; the instances of honest men being corrupted by "dirty money," if not nonexistent, are at least exceedingly rare. The proper response to coercion by corrupt public officials should be to go to the authorities, not to make the payoff. Thus, unless the extortion is so overpowering as to negate criminal intent or willfulness, we would be loath to allow those who give in to the illegal coercion to claim it as a total defense to bribery charges.

For all these reasons, we agree with Judge Motley that the Pennsylvania courts would not recognize proof of extortion as a complete defense to bribery charges, but would find the defense relevant only on the issues of intent and willfulness. Perhaps foreseeing this result, appellants claim that, even recognizing the validity of the general *Barash I* principle, Judge Motley's instructions on the extortion defense were erroneous.

ence any . . . municipal or other public officer in the discharge, performance, or nonperformance of any act, duty or obligation pertaining to such office, is guilty of corrupt solicitation." 53 Pa.Stat. § 35911:
"Any person who shall . . . give, or promise . . . any money . . to any member of council or other city officer . . . to influence him in the performance or nonperformance of any of his public or official duties, shall be guilty of bribery."

5. Appellants cite such cases as Commonwealth v. Francis, 201 Pa.Super. 313, 191 A.2d 884 (1963), cert. denied, 375 U.S. 985, 84 S.Ct. 517, 11 L.Ed.2d 472 (1964), where it was stated that "it is generally held that" bribery and extortion are "mutually exclusive crimes," 191 A.2d at 889. In return, the government cites Commonwealth v. Bardascino, 210 Pa.

Super. 202, 232 A.2d 236 (1967), where a magistrate and court clerk were convicted of both bribery and extortion in connection with demanding and receiving $100 in setting a low bail for a defendant. In *Bardascino*, the appellants were held entitled to an accomplice charge with respect to the testimony of the payor, since, but for immunity, he could have been convicted of bribery. 232 A.2d at 242. The government argues, rather convincingly, that if extortion were a complete defense, the payor could not be convicted of bribery, in view of the previous extortion convictions of the magistrate and clerk.

While the government thus probably has the better of the dicta, we are reluctant to rely heavily upon these cases, where the basic issue was not even raised, and where the statements were made in contexts far different from the one at hand.

■ At the outset, it is clear that Judge Motley's instructions virtually mirrored those approved by this court in United States v. Barash, 412 F.2d 26 (2d Cir.), cert. denied, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969) (*Barash II*). Kahn and Teleprompter, however, point to two instances where the charge deviated, albeit slightly, from *Barash II* and claim prejudicial error.

First, appellants object to that portion of the charge where Judge Motley told the jury that bribery is committed where "the paying party intended that the official be influenced in some way." They claim that the correct instruction would be that the defendant must have intended to influence the official in *public* actions, and since a bribe by definition is designed to influence "in some way," this charge amounted to a directed verdict of conviction.

Whatever the technical merits of appellants' reasoning, it is inapplicable here. The objected language here occurred but two sentences after the point where the jury was told that bribery required the intent to influence a "public officer with respect *to any official act*." (Emphasis added). Following so closely on such an instruction, the objected language hardly constituted prejudicial error. Indeed, on the facts of this case, it is difficult to see how the jury could have been affected at all by the challenged instruction. It was undisputed that the money was paid to secure the franchise, and awarding of the franchise was surely an official act.

Appellants' second objection to the charge is similarly meritless. In explaining the extortion defense, Judge Motley told the jury that economic coercion was relevant to the issue of whether the defendants "had the requisite intent to influence action of a public official." Again, the claim is that the correct charge should have been "official action." But in the factual context of this case, where nothing but official action was at issue, and given the earlier instruction about bribery requiring the intent to influence an officer "with re-

spect to any official act," there was clearly no error. Looking at the charge as a whole, *Barash II, supra*, 412 F.2d at 30, we find that Judge Motley fairly and completely presented the extortion defense to the jury, which clearly rejected it.

## III. RULINGS ON THE EVIDENCE

Kahn (but not Teleprompter) has attacked five specific evidentiary rulings by Judge Motley. In each instance, he claims that the ruling unfairly restricted him in presenting his basic extortion defense. We find no error in the rulings, either individually or collectively.

### A. *Evidence that Tompkins was Corrupt.*

■ Judge Motley excluded an offer of proof that Kahn claims would have established Tompkins' "habitual corruption." The proof would have shown that one Cornelius, now deceased, had made collections from billiard parlors, card games, and local clubs, in order that these activities might remain in business. The proof would have shown that Cornelius' driver picked him up at City Hall daily, drove him on his rounds, and always dropped him off at City Hall. Kahn claims that this conduct is traceable to the mayor, and buttresses his extortion defense.

Judge Motley's exclusion of the proof was an appropriate exercise of her discretion. First of all, there was no clear link between Cornelius' alleged conduct and Tompkins. Moreover, the offer presented the very real danger of degenerating into a side trial, both to determine whether the "collections" actually occurred, and to determine whether the mayor was behind this activity. Much as Kahn would have preferred that this trial be one of Tompkins, not himself, the proffered evidence seems clearly collateral and of doubtful probative value.

Recognizing the dangers of confusing the jury with collateral issues, we have recently emphasized the general rule that prior misconduct of a witness not

resulting in a conviction is inadmissible as direct proof. United States v. De-Sapio, 456 F.2d 644, 648 n. 1 (2d Cir. 1972); United States v. Glasser, 443 F.2d 994, 1003 (2d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). That rule has particular relevance here, where the misconduct is not clearly linked to the relevant witness. Under the circumstances of this case, Judge Motley did not err in excluding this evidence.[6]

### B. *Evidence Relating to Trans Video Company and All State Systems.*

■ At the December 21 and 28, 1965 meetings of the Johnstown City Council, representatives of five concerns announced that they were interested in bidding. Two of these prospective bidders were not named at the meetings; the other three were Trans Video Company of Barnesboro, Pa., All State Cable Company of Ridgeway and Doylestown, Pa., and Johnstown Traction Company.

At trial, Kahn offered to show that neither All State nor Trans Video had a telephone listed under those names during 1965–67; and that All State did not operate a cable system in Doylestown.[7] Judge Motley excluded the evidence. Kahn now argues that the proof would have demonstrated that these two bidders did not exist, and that they were part of Tompkins' plot to extort money from Teleprompter.

We find no error in Judge Motley's ruling. Even assuming *arguendo* that failure of a company to have a phone number under its precise corporate name

is probative of nonexistence, the other premises do not follow. First of all, there was no evidence to link this alleged sham up to Tompkins, who stated on the stand that he knew nothing of these two firms before the date of the bidding. Second, when the time for actual bidding, February 1, 1966, did arrive, each of the three companies made formal bids—Johnstown Traction's accompanied by a bid bond and All State's by a $10,000 check. In addition, C.A.T.V. Corporation of Pittsburgh submitted a formal bid. Finally, Kahn makes no claim that Johnstown Traction or the Pittsburgh firm did not exist. The possibility of the mayor's use of phony firms to blackmail Teleprompter is greatly lessened, if not negated, by the actual submission of bids by these firms and by the involvement of admittedly genuine corporations in the entire process.

In short, the evidence was not truly probative on the extortion issue, and even if probative, was clearly collateral. The trial court quite properly exercised its discretion in excluding it. *See generally* C. McCormick, Evidence § 152 at 319–20 (1954); United States v. Bowe, 360 F.2d 1, 15 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966).

### C. *Limiting Cross-examination of Deardorff.*

■ On direct examination and on cross-examination by Kahn, Deardorff testified about the January 24, 1966 meeting at the Holiday Inn. During

---

**6.** United States v. Bowe, 360 F.2d 1 (2d Cir.), cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966), upon which Kahn heavily relies, is not to the contrary. It is true that Judge Moore in *Bowe* recognized that evidence of a police agent's past entrapment activities was relevant to a defendant's claim that the officer caused him to commit a crime he otherwise would not have. But Judge Moore went on to note that exclusion of the evidence in that particular case was not error, in view of the limited probative value of the evidence and the very real

danger that the jury would be misled into a "trial within a trial." 360 F.2d at 15–16. Thus, the *Bowe* court recognized that a trial judge has broad discretion in deciding whether to admit such evidence, after balancing the dangers of its introduction against its probative value. *Cf.* United States v. Costello, 221 F.2d 668, 674 (2d Cir. 1955), aff'd, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Judge Motley correctly exercised such discretion in the case at hand.

**7.** The offer did not indicate that All State did not operate a system in Ridgeway.

further cross-examination by Teleprompter, Deardorff said that he could not recall whether any bids were in before that January 24 meeting. Counsel for Teleprompter attempted to pursue the issue, but Judge Motley cut him off: "He says he doesn't recall. . . . Proceed."

Kahn then attempted to pursue this line on recross. Judge Motley, consistent with her previous ruling, refused to allow the questioning. Kahn now claims that had he been allowed to proceed, Deardorff would have admitted that the bids were in fact in at the time of the meeting, which would have shown that the rendezvous took place after February 1. This, in turn, would have buttressed Kahn's claim that the payments were not promised until February 10.

It is a basic principle that a trial judge has extensive discretion in controlling the scope and length of cross-examination. See, e. g., Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Dorfman, 470 F.2d 246 (2d Cir., 1972). The basic rule would seem to apply with special force to recross, especially after a full and searching cross-examination. *Cf.* Turner v. United States, 441 F.2d 736 (5th Cir. 1971). Here, there was clearly no abuse of Judge Motley's discretion. Kahn's argument is based on the sheer conjecture that, given recross, Deardorff would have broken down and changed his story. While we doubt that such speculation can ever justify extended recross, the evidence in this case makes such a course particularly inappropriate. Deardorff testified that the meeting took place at the Holiday Inn, and both Tompkins and Kahn, not to mention the motel records, put the date of this encounter at January 24. Moreover, Deardorff testified that he promised Kahn his vote at the meeting, and that Kahn had tried to "cancel the bidding." Neither of those statements is consistent with a meeting after February 1, when the bidding had occurred and the votes were in.

**D.** *Exclusion of a Statement Claimed to Have Been Made by Tompkins.*

█ As part of the defense, Paul Malinowsky, a Johnstown City Councilman, testified. Part of his testimony would have been that the mayor had said several weeks earlier, "I'll tell you one thing, if I am going to go down, everybody is going to go down with me." Judge Motley excluded that statement as an attempt to impeach a witness through collateral matters.

Kahn, citing cases that hold that bias is never a collateral matter, *e. g.*, United States v. Haggett, 438 F.2d 396 (2d Cir.), cert. denied, 402 U.S. 946, 91 S.Ct. 1638, 29 L.Ed.2d 115 (1971), claims that the statement exposed Tompkins as vindictive, and showed his clear motive to lie on the stand. But, at least on its face, the excluded statement is not convincing evidence of bias. The more likely reading of the words, as the government suggests, is simply that Tompkins, once exposed, was going to make a full disclosure and make sure that his co-conspirators did not escape their just deserts. Given the ambiguous nature of the proffered statement, its exclusion was not error.

█ Moreover, we note that Tompkins was never confronted with the statement on cross-examination. Professor Wigmore has suggested that the same reasons of fairness that require that a witness be given an opportunity to explain away a prior inconsistent statement also apply when the utterance is claimed to show bias, Wigmore, Evidence § 953 (Chadbourne rev. 1970), and a number of courts have agreed. Smith v. United States, 283 F.2d 16, 20–21 (6th Cir. 1960), cert. denied, 365 U.S. 847, 81 S.Ct. 808, 5 L.Ed.2d 811; United States v. White, 225 F.Supp. 514, 519–521 (D.D.C.1963), rev'd on other grounds, 121 U.S.App.D.C. 287, 349 F.2d 965 (1965). We noted our approval of this rule in United States v. Hayutin, 398 F.2d 944, 953 (2d Cir.), cert. denied,

393 U.S. 961, 89 S.Ct. 400, 21 L.Ed.2d 374 (1968), and we reiterate that approval today. While we hold that exclusion of the statement under any event was not reversible error, the proper course should have been to confront Tompkins with it on cross-examination, to allow him to explain or deny it. Such a procedure is especially desirable in a case like this, where the utterance is ambiguous on its face, and where confrontation may aid in interpretation.

E. *Judge Motley's Refusal to Give an Advisory Ruling On the Scope of the Government's Cross-examination of Kahn.*

 Prior to the beginning of the trial, the government indicated that it hoped to offer evidence with respect to a payment of $50,000 in 1968 by Teleprompter to city officials in Trenton, New Jersey. Judge Motley ruled that the prejudicial effect of such evidence would outweigh its probative value, and she excluded it. She refused, however, to give an advance ruling about whether this evidence could be used in cross-examination if Kahn took the stand, saying that in some cases it might be proper.

Kahn never took the stand. He now claims that Judge Motley's refusal to rule out cross-examination on the point was error, and that it was this ruling that prevented him from testifying in his own defense.

While we have made it clear that a trial judge has the power to give an advance ruling on the permissible scope of cross-examination, United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968), cert. denied, 394 U.S. 947, 89 S.Ct. 1281, 22 L.Ed.2d 480 (1969), it is also clear that such "highly discretionary adjudications" will not be reversed "unless the wisdom of so doing is very clear." *Id.* at 274; Brooke v. United States, 128 U.S.App.D.C. 19, 385 F.2d 279, 286 (1967). We have explicitly refused to turn the *Palumbo* rule of discretion into one of compulsion, and have indeed emphasized that the trial court's power to limit cross-examination is often best exercised after hearing the direct testimony of the witnesses. United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969); United States v. Crisona, 416 F.2d 107, 117 (2d Cir. 1969), cert. denied, 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970); United States v. Cacchillo, 416 F.2d 231, 234 (2d Cir. 1969). Judge Motley's actions here clearly fall far short of constituting an abuse of discretion.

III. THE PERJURY COUNT

Kahn has mounted a four-pronged attack against his perjury conviction. He claims (1) that he was prosecuted under the wrong statute; (2) that without regard to the proper statute, Judge Motley erred in her jury instructions concerning recantation; (3) that the trial court erred in allowing the jury to consider his January 27, 1971 grand jury testimony as evidence of the falsity of his original December 17, 1970 testimony; and (4) that Judge Motley erred in instructing the jury about what constitutes perjury.

 Kahn was indicted under 18 U.S.C. § 1621, the general perjury statute. However, on October 15, 1970, Congress enacted Pub.L. 91–452, the Organized Crime Control Act of 1970. *Inter alia,* that Act added § 1623 to Title 18. That section, applicable only to false declarations made in court proceedings or before grand juries, does away with the ancient "two-witness" evidentiary rule in perjury cases, and provides:

"(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission was made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."

Kahn now cites cases such as Kepner v. United States, 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114 (1904); Shelton v. United States, 83 U.S.App.D.C. 32, 165 F.2d 241, 244 (1947); and Wechsler v. United States, 158 F. 579, 581 (2d Cir. 1907), for the proposition that a statute aimed at specific conduct prevails over an otherwise applicable general statute. Just as *Shelton* and *Wechsler* found perjury prosecutions improperly brought under the general statute when special perjury statutes were available, Kahn would have us find that he should have been prosecuted under § 1623, not § 1621. And, he claims, had the prosecution been under § 1623, his January 27 "recantation" would have barred perjury prosecution.

 In response, the government claims that § 1623 did not repeal § 1621, and that the prosecutor has the absolute discretion to choose which section an alleged perjurer will be tried under, and consequently, what evidentiary rules will apply to his trial. While it is clear that § 1623, which applies only to grand jury and court proceedings, did not wholly replace § 1621, which covers oaths before any "competent tribunal, officer, or person," we admit great skepticism about the second half of the government's argument. While perhaps Congress constitutionally could have placed such wide discretion in the prosecutor, we find no clear indication that it meant to do so here.[8] And, we find not a little disturbing the prospect of the government employing § 1621 whenever a recantation exists, and § 1623 when one does not, simply to place perjury defendants in the most disadvantageous trial position.

However, we need not reach the merits of the government's position in the case before us. Even assuming *arguendo* that the indictment named the wrong statute, there was no prejudice to Kahn. The substantive elements of perjury are the same under either statute, and since the trial court applied the "two-witness" rule, Kahn got at least his due, if not more, on the evidence. Kahn's only serious claim is that § 1623(d) entitled him to a complete recantation defense. But at the time of Kahn's January 27 grand jury testimony, Tompkins, Deardorff, and McKee had all testified to the bribes that Kahn had falsely denied on December 17. We find, as did Judge Motley, that on January 27 it had already "become manifest that such falsity has or will become exposed," so that, by its own terms, a § 1623(d) defense was not available to Kahn.[9] And, absent the

8. The legislative history cited by both sides is inconclusive. The government refers to comments by the Justice Department, incorporated in S.Rep. 91–617, 91st Cong., 2d Sess. 109 (1969), that § 1623 is "an additional felony provision" which · is intended to "supplement, not supplant existing perjury provisions"; and to comments by an A.B.A. representative that § 1623 "is not an amendment of the present perjury statute but . . . a new addition." Hearings on S. 30 before Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. 264 (1969). But such comments can be explained by the fact of § 1623's limited reach; even if § 1623 were the exclusive vehicle for prosecutions of perjury before courts and grand juries, § 1621 would still be needed to reach false declarations before administrative tribunals and others, and hence would not be supplanted or amended by the new section.

Conversely, Kahn's reliance upon a statement by a Justice Department representative that § 1621 covers proceedings that § 1623 does not, Hearings on S. 30 before Subcommittee No. 5 of the House Committee on the Judiciary, 91st Cong., 2d Sess. 637 (1970), hardly shows that § 1623 is the sole vehicle for prosecuting perjury committed before courts and grand juries. Even if the government's argument about both sections being available here were correct, § 1621 would extend to administrative proceedings, which § 1623 clearly does not.

9. Moreover, since § 1623(d) says that an admission of the falsity of the prior declaration "shall *bar prosecution*," (emphasis added) it would seem that the defense should be raised prior to trial, and disposed of then by the judge. Here, the issue was not raised until just before the charge to the jury, in a motion for a judgment of acquittal.

availability of such a defense, there was no prejudice here even if the government named the wrong statute. United States v. Clizer, 464 F.2d 121, 124–125 (9th Cir. 1972). *See also,* United States v. Hutcheson, 312 U.S. 219, 229, 61 S.Ct. 463, 85 L.Ed. 788 (1941); United States v. Nixon, 235 U.S. 231, 235, 35 S.Ct. 49, 59 L.Ed. 207 (1914); Williams v. United States, 168 U.S. 382, 389, 18 S.Ct. 92, 42 L.Ed. 509 (1897); United States v. Calabro, 467 F.2d 973, 981 (2d Cir. 1972); United States v. Galgano, 281 F.2d 908, 910–911 (2d Cir. 1960), cert. denied, Carminati v. United States, 366 U.S. 960, 81 S.Ct. 1916, 6 L.Ed.2d 1253 (1961); United States v. McKnight, 253 F.2d 817, 820 (2d Cir. 1958); Fed.R. Crim.P. 7(c).

■ Kahn next claims that Judge Motley erred in instructing the jury about his January 27 "recantation." He requested a charge that recantation is "potent evidence to negative a wilful intent to swear falsely," citing Beckanstin v. United States, 232 F.2d 1, 4 (5th Cir. 1956). Instead Judge Motley told the jury that "recantation or retraction is relevant only in showing an absence of intent to commit perjury. It does not excuse the initial perjury."

*Beckanstin,* upon which Kahn relies, is readily distinguishable from the case at hand. In *Beckanstin,* the defendant, when asked what school he had graduated from, responded, "Massachusetts Institute of Technology." In fact, he had merely attended the school, and corrected his testimony as soon as he realized the mistake. In reversing a perjury conviction, the Fifth Circuit not only felt that the misstatement was not material, but that all the circumstances

showed no intent to deceive. It was within this context, where the appellate court ruled that the perjury indictment never should have gone to the jury, that the "potent" language appears.

There were no such exigent circumstances here, and there was ample evidence to go to the jury on perjury. Judge Motley's instructions represented an accurate characterization of the law, and we find no error in her giving them. *See* United States v. Norris, 300 U.S. 564, 576, 57 S.Ct. 535, 81 L.Ed. 808 (1937); United States v. Lococo, 450 F. 2d 1196, 1198 n. 2 (9th Cir. 1971). *Cf.* United States v. Hirsch, 136 F.2d 976, 977 n. 1 (2d Cir.), cert. denied, 320 U.S. 759, 64 S.Ct. 66, 88 L.Ed. 452 (1943).

■ Kahn next contends that his January 27 grand jury testimony could not have been used by the jury to decide the falsity of his December 17 testimony, and that Judge Motley erred by instructing to the contrary. But in United States v. Goldberg, 290 F.2d 729, 733–735 (2d Cir.), cert. denied, 368 U.S. 899, 82 S.Ct. 176, 7 L.Ed.2d 94 (1961) and United States v. Marchisio, 344 F.2d 653, 665 (2d Cir. 1965), we held that extrajudicial statements which contradict a defendant's sworn testimony were admissible to prove perjury.[10] The same result would seem to apply *a fortiori* to prior judicial testimony, which is certainly no less of an admission than extra-judicial utterances and can invariably be put in evidence through the use of certified transcripts, thus avoiding difficulties inherent in witnesses' recollection. The use of the January 27 testimony here was proper.[11]

■ Finally, Kahn claims that Judge Motley erred in failing to instruct

---

10. The narrow question in *Goldberg* and *Marchisio* was whether the statement could be used, in addition to independent corroborative evidence of perjury, to satisfy the "two-witness" rule, which had been designed to prevent convictions based upon an "oath against an oath." We held in both cases that the independent evidence in effect served as the first witness, so that prior statements might take the

role of the second one. In the case at hand, there is no claim that, apart from the January 27 testimony, there was not sufficient independent proof of perjury to satisfy the two-witness rule.

11. Indeed, if we accept Kahn's view and characterize this prosecution as one under the new perjury statute, § 1623(c) explicitly makes the prior inconsistent testimony admissible.

the jury that a "literally truthful" answer could not constitute perjury. Instead, she merely told the jury that to constitute perjury, a statement had to be false.

We find no error in those instructions. Neither the majority opinion nor the dissent in United States v. Bronston, 453 F.2d 555 (2d Cir. 1971), cert. granted, 405 U.S. 1064, 92 S.Ct. 1495, 31 L. Ed.2d 793 (1972), suggests a different result. Both Judge Oakes' panel opinion and Judge Lumbard's dissent recognized in *Bronston* that the defendant's actual response to the question put was indisputably true.[12] The opinions part company on the issue of whether an acquittal should have been granted *as a matter of law,* or whether the false implication and evasiveness in the answer justified leaving the issue of perjury to the jury. Here, Kahn's answers *themselves* surely could have been found false by the jury; indeed, it would have been surprising if they had not so found.[13] There was overwhelming evidence of perjury in the record, and the jury would have been remiss in reaching any other conclusion.

## IV. THE APPLICABILITY OF THE TRAVEL ACT

Kahn next claims that since the transactions in question here were "isolated" and had no connection with a comprehensive scheme of interstate racketeering, application of the Travel Act, 18 U.S.C. § 1952, was improper. He relies chiefly upon Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), and two of its progeny, United States v. Altobella, 442 F.2d 310 (7th Cir. 1971), and United States v. McCormick, 442 F.2d 316 (7th Cir. 1971).

None of those cases calls for reversal of the Travel Act convictions here. In *Rewis,* the Supreme Court held that neither the language nor the legislative history of the Travel Act showed that Congress intended the statute to apply to a purely local gambling operation just because some of its *customers* crossed state lines. *Altobella* reached a similar result in a case where the only use of interstate facilities resulted from the fact that an extortion victim cashed a check on an out-of-state bank to pay off the defendants. Similarly, in *McCormick* the only ostensible interstate facet of the crime, running an illegal Indiana lottery, occurred when a local newspaper in which the defendant had advertised for some salesmen mailed some of its copies out of state.

The common thread through each of these decisions is that the defendants themselves engaged in no interstate activities, and that the total interstate travel aspect of the enterprises was either marginal or unforeseen. Indeed, the *Rewis* court left open the question of whether proof of active solicitation of an interstate clientele might come within the Act, and cited with explicit approval cases where the statute was applied to individuals whose agents or employees crossed state lines in furtherance of an illegal activity. 401 U.S. at

---

12. The defendant in *Bronston* responded to a question about whether he had a Swiss bank account with the answer "The company had an account there for about six months, in Zurich." It was undisputed that the company did have such an account; the majority and the dissent take issue on whether a perjury conviction would be sustained on the ground that the answer constituted a lie by negative implication, i. e., that Bronston himself did not have such an account.

13. For example, the indictment includes this colloquy among its assignments of perjury:

"Q. Isn't it a fact that really what happened here is, you agreed to give Mayor Tompkins, $7500, and the best way it could be disguised was camouflage this fee by the payment to George Daley and Kenneth Tompkins, Jr., which went back to his father?
A. It's not a fact, absolutely not.
Q. Would it surprise you to learn that the $7500 that you paid Kenneth Tompkins, Jr., went to his father?
A. It would."
While Kahn was surely entitled to argue to the jury that he was in fact surprised, *we* would have been surprised had they agreed.

813, 814, 91 S.Ct. 1056. And, in United States v. Lee, 448 F.2d 604, 606–607 (7th Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 107, 30 L.Ed.2d 100 (1971), the Seventh Circuit found *Rewis* and *Altobella* inapplicable where the interstate travel was that of a member, rather than a victim, of the illegal enterprise.

The case at hand shows a knowing and intentional use of interstate commerce not only by various members of the conspiracy, but also by Kahn himself. Kahn went from New York to Johnstown and agreed upon the illegal payments; Kahn arranged for one check to be mailed from New York to Pennsylvania; the mayor and his son came up from Johnstown to New York on two separate occasions to collect payoff checks from Kahn and Teleprompter. Such activities, far from representing the unforeseen and marginal use of interstate facilities present in *Rewis* and its progeny, constituted conduct central to the illegal enterprise performed by partners to the crime. The Travel Act was correctly applied. *Cf.* United States v. Levine, 457 F.2d 1186, 1188–1189 (10th Cir. 1972).

## V. THE COMPOSITION OF THE GRAND JURY

Both at the trial court and on appeal, Teleprompter and Kahn have mounted a massive attack upon the composition of the grand jury that returned the indictment. The challenge is basically three-pronged: (1) that the Southern District Plan for Random Jury Selection, which mandates the use of voter registration lists as the source of names of those who sit on grand juries, is unconstitutional because it results in underrepresentation of those between the ages of about 24 and 30 because they tend to register in fewer numbers than older voters; (2) that since the grand jury plan at the time of the indictment excluded all 18–20 year olds, they were denied equal protection;[14] and (3) that the refilling of the grand jury master wheel every four years conflicts with the Federal Jury Selection and Service Act, 28 U.S.C. § 1861 et seq.

The first two contentions are foreclosed by the thoughtful opinion of Judge Hays in United States v. Guzman, 468 F.2d 1245 (2d Cir., 1972), which carefully considered and rejected identical claims. We see no reason to add to what was said in that decision here.

As to the third claim,[15] it finds its basis in the language of 28 U.S.C. § 1869(c), which defines "voter lists" as those from "either the most recent State or the most recent Federal general election." Teleprompter and Kahn contend that this provision reflects a requirement by Congress that the master jury wheel be refilled every two years. They point to a passage in H.R.Rep.No.1076, 90th Cong., 2d Sess. (1968), 1968 U.S. Code Cong. & Adm.News pp. 1792, 1806–1807, stating that the statute insures "that the list used will in any event not be more than 2 years old," as supporting this view.

At the time of the indictment here, 28 U.S.C. § 1863(b)(4) only required that a jury selection plan "provide for periodic emptying and refilling of the master jury wheel at specified times." Surely if Congress intended that the wheel be refilled every two years, it could have found a more direct way of saying so.[16] Indeed, H.R.Rep.No.1076 makes it clear that this provision was adopted to avoid court clerks' objections to previous drafts, which had required refilling of the master wheel at "specific times." 1968 U.S.Code Cong. & Adm.News at p. 1800.

---

14. By an amendment on April 6, 1972, 28 U.S.C. § 1865(b)(1) now provides that 18 years of age is the minimum age for grand and petit jury service. Pub.L. 92–269; 86 Stat. 117.

15. This contention was considered, and rejected, by the district court in *Guzman*, 337 F.Supp. 140, 145 (S.D.N.Y.1972), but was not raised on appeal. 468 F.2d at 1247 n. 4.

16. In fact, Congress on April 6, 1972 amended § 1863(b)(4) to provide for refilling every four years. Pub.L. 92–269; 86 Stat. 117.

We find that the Southern District Plan's requirement of refilling every four years did not conflict with the Act. *Accord,* United States v. Kuhn, 441 F.2d 179 (5th Cir. 1971). Such an interpretation is wholly consistent with the language relied upon by appellants in the House Report. The entire sentence in which the "two year" language appears reads as follows: "Accordingly, while the two subsections [§ 1869(c) and (d)] permit the plan to choose between State and Federal lists, they also insure that the list used will in any event be not more than 2 years old." This passage, when read in conjunction with the other provisions of the statute, appears to say that when a new list is *chosen,* that new list itself must be less than 2 years old. Thus, while the time of refilling is left to the districts, the maximum permissible age of the list used is not.

## VI. THE NEW TRIAL MOTIONS

As noted previously, McKee was tried subsequently to Kahn and Teleprompter. Relying on several pieces of testimony from that trial, appellants made a motion for a new trial based on newly discovered evidence to Judge Motley. She denied the motion; Kahn and Teleprompter assign that denial as error.

 The general standard governing motions for a new trial on the grounds of newly discovered evidence is familiar. The evidence must have been discovered after trial, must be material to the factual issues at the trial and not merely cumulative and impeaching, and of such a character that it would probably produce a different verdict in the event of a retrial. United States v. DeSapio, 456 F.2d 644, 647 (2d Cir. 1972); United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969). The function of a court of appeals in reviewing a denial of an ordinary new trial motion is a limited one; the motion is directed to the trial court's discretion and factual determinations may not be set aside on review unless "wholly unsupported by evidence." United States v. Johnson,

327 U.S. 106, 111–112, 66 S.Ct. 464, 90 L.Ed. 562 (1946); United States v. Silverman, 430 F.2d 106, 119–120 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S. Ct. 1619, 29 L.Ed.2d 123 (1971).

 However, the strict standards of the general rule are relaxed where the newly discovered evidence was known to the government at the time of trial, but not disclosed. If it can be shown that the government deliberately suppressed the evidence, a new trial is warranted if the evidence is merely material or favorable to the defense. Giglio v. United States, 405 U.S. 150, 153–154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The same rule applies, even in the absence of intentional suppression, if it appears that the high value of the undisclosed evidence could not have escaped the prosecutor's attention. *Polisi, supra,* 416 F.2d at 577; United States v. Keogh, 391 F.2d 138, 146–147 (2d Cir. 1968). In each of these instances, the materiality of the evidence to the defendant is measured by the effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict. *Polisi, supra;* United States v. Bonanno, 430 F.2d 1060, 1063 (2d Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970); Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant, 74 Yale L.J. 136, 145–47 (1964).

 If the government's nondisclosure is merely inadvertent, and does not involve evidence whose high value to the defense could not have escaped notice, however, a somewhat stronger burden is put on the defendant. While the movant is still not required to show the probability of a different verdict upon retrial, setting aside a conviction is only called for when there is "a significant chance that this added item, developed by skilled counsel as it would have been could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller,

411 F.2d 825, 832 (2d Cir. 1969); United States v. Mayersohn, 452 F.2d 521, 526 (2d Cir. 1971).

 Appellants here cite two pieces of evidence presented at the McKee trial that were admittedly known to the government at the time of their trial. As to each of these, they claim that the high value to the defense could not have escaped the prosecutor's notice, and thus that a new trial is warranted because of materiality.

The first piece of testimony cited is that of Warren Reitz, one of the principals in the Johnstown Traction Company. He testified at McKee's trial that on February 1, 1966, just before the bids were opened, McKee told him "Warren, this isn't the way to do this, you should have seen me before." Kahn and Teleprompter now claim that this shows that the bribe had not yet been made, and buttresses their claim that it was not until February 10, following Tompkins' extortion, that they caved in.

The claim is frivolous. The remark would seem to prove just the opposite— that submitting a bid on February 1 was useless, since Teleprompter had already assured itself of the contract with its January 24 bribe. Not only is it impossible for us to conclude that the value of this evidence could not have escaped the government's notice, we doubt whether it is at all material or favorable to the defense. And, it goes virtually without saying that we see no significant chance, under the more demanding *Miller* standard, that development of this item would have avoided a conviction.

The second piece of newly discovered evidence was based upon a memorandum of an interview by the government with McKee in June, 1971. That memorandum, used by the government in cross-examining McKee at his trial, apparently disclosed[17] that McKee had large amounts of cash in his possession; $10,000 in a safe deposit box and $5000 at home.

Appellants argue that this evidence would have established McKee's corruption, and that its value as part of the extortion defense could not have escaped the government. Again, we disagree and see no error in the denial of the new trial motion. First, it requires several giant steps of conjecture to get from the existence of these cash hoards to McKee's participation in systematic extortion.[18] Second, even if the evidence is assumed *arguendo* to be probative of McKee's corruption, it is difficult to see what use the defense could have made of it here. Only Tompkins and Deardorff testified for the government at the Teleprompter-Kahn trial; this evidence could hardly have been used to impeach them, since it involves McKee and does not amount to a conviction. And, even leaving aside the doubtful proposition of whether such evidence could be used to impeach McKee himself,[19] it is simply fanciful on appellants' part to suggest that McKee would have been called to testify had they known about the cash hoards. McKee was, at the time of the Teleprompter-Kahn proceedings, awaiting his own trial; there is not a shred of evidence to suggest that he would have waived the Fifth Amendment to take the stand here. Indeed, appellants offer only conjecture as to how this evidence could have been used at all, even in trial preparation. Under any standard of review, Kahn and Teleprompter were not entitled to a new trial on this ground.

 The final three pieces of newly discovered evidence involve alleged in-

17. Appellants have apparently never seen the memorandum; they base their claims as to its contents upon the substance of McKee's cross-examination.

18. Indeed, since the cash was in McKee's possession as late as 1971, at least $5000 of it may have come from the episode in question here.

19. Since the evidence does not amount to a criminal conviction, it would ordinarily be inadmissible to impeach the credibility of a witness. *See* the discussion in Part IIIA, *supra*.

consistencies between the testimony of the city officials at the two trials. No claim is made that these "inconsistencies" were known to the government at the time of the first trial,[20] so the strictest standard of review applies— would the evidence probably produce a different verdict upon retrial?

The first of these claims is based upon Tompkins' testimony at the McKee trial, where he testified that he had asked Kahn to make the payment in cash or stock. At the Kahn-Teleprompter trial, the mayor had denied asking for cash. As Judge Motley found, this evidence at most is impeaching; it seems only to raise a minor question about how the bribe was requested to be paid. There is clearly no real probability that use of this inconsistent statement on cross-examination of Tompkins would have led to a different result in the Kahn-Teleprompter trial, and there was no abuse of discretion in denying the new trial motion on this ground.

Next, appellants claim that Deardorff changed his testimony about what occurred at the Holiday Inn. They claim that while Deardorff testified at the first trial that Kahn had gone into the bathroom with all three officials and made the offer, he testified at McKee's trial that the subject was broached with him first, and then taken up with the group. Judge Motley doubted that there was any real inconsistency between the two pieces of testimony at all, and we see no reason to quarrel with that conclusion. Indeed, even if Deardorff did change his story on this ground at the McKee trial, the "newly discovered evidence" here hardly meets the strict standard necessary to set aside a jury verdict.

Finally, appellants claim that Deardorff changed his testimony at the McKee trial about whether he talked about the case with other city officials before the trial. Again, even assuming that inconsistencies in the testimony do exist, the evidence would hardly have changed the verdict at the first trial. Considered collectively or individually, the pieces of newly discovered evidence did not warrant a new trial, and Judge Motley did not err in so ruling.

## VII. CONCLUSION

█ We have carefully considered appellants' other claims, including Kahn's contentions of prosecutorial misconduct and Teleprompter's argument that the admission of the December 17 grand jury testimony against the corporation was error, and we find no merit in them.[21] The judgments of conviction are affirmed.

**20.** Appellants do suggest that since they have no proof that the government knew of this evidence at the time of the first trial, the proper course would be to remand for an evidentiary hearing where they might be able to establish the point. "We see no reason to provide this relief and no precedent for it." *DeSapio, supra,* 456 F.2d at 652.

**21.** Citing Northern Oil Co. v. Socony Mobil Oil Co., 347 F.2d 81 (2d Cir. 1965), Teleprompter claims that before an employee's testimony can be attributed to the corporation, there must be a strict showing of specific authorization. However, *Northern Oil* is clearly distinguishable from the case at hand. There, the contested testimony was that of a temporary assistant to a district sales manager; here, Kahn was president, founder, chairman of the board, and a major stockholder of Teleprompter. In this context, the claim that his testimony was not admissible against the corporation is absurd.