Peter CORSO, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 74 Civil 720.

United States District Court,
S. D. New York.

Dec. 23, 1974.

Joseph I. Stone, New York City, for petitioner.

Paul J. Curran, U. S. Atty. for the Southern District of New York, New York City, for United States of America; John M. Walker, Jr., Asst. U. S. Atty., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner Peter Corso, also known as Peter Carbone, was convicted in February, 1972, by this court after a two-day nonjury trial on two counts: (1) possession with intent to distribute three kilograms of heroin; and (2) conspiracy to violate the narcotics laws.[1] He was sentenced on March 15, 1972 to five years imprisonment on each count, to run concurrently, to be followed by a special parole period of three years. He now moves pursuant to 28 U.S.C., section

---

1. 21 U.S.C. §§ 846 and 841.

2255, to vacate the judgment of conviction, to dismiss the indictment, or alternatively for a new trial.

Petitioner, originally appearing pro se, urged in the main violation of his right (1) to adequate legal representation during his trial and with respect to an appeal; (2) to due process of law based upon perjury committed by government witnesses; and (3) against unlawful search and seizure in the use of illegal wiretaps. The government, after exhaustive investigation, acknowledged the existence of unauthorized wiretaps but contended that his arrest and subsequent conviction were not the result of those taps. It denied petitioner's other allegations and consented to a hearing limited to the issue of whether petitioner's conviction was tainted by the illegal wiretaps. Thereupon this court appointed counsel to represent petitioner and extended the scope of the hearing to embrace all of petitioner's claims. At the hearing, the claim of inadequate representation of counsel during his trial and upon appeal was withdrawn.[2]

To place petitioner's remaining claims in proper perspective, it is desirable first to summarize the trial testimony.

Petitioner was indicted together with Merritt C. Johnston for the substantive crime and conspiracy to commit it. Johnston, prior to trial, pled guilty and the case proceeded against petitioner as the sole defendant. The evidence established that Detective Louis D'Ambrosio of the New York City Police Force, in an undercover role as a narcotics purchaser, came into contact with Johnston. On September 30, 1971, in Johnston's apartment at 46–48 Downing Street, New York City, D'Ambrosio negotiated the purchase of three kilograms of heroin at $18,000 a kilo. In D'Ambrosio's presence, Johnston then made a phone call to his new "connection," asking "are there any more of the shirts that I had seen earlier available?" Johnston,

after hanging up, informed D'Ambrosio he would be able to sell him the heroin. Thereafter, various conversations were had between Johnston and D'Ambrosio for its purchase and delivery. On October 5, 1971, at 1:15 p. m., D'Ambrosio again met Johnston at the latter's apartment. Johnston told D'Ambrosio the price now was $20,000 per kilogram, to which the latter agreed. After some discussion they arranged to consummate the sale in Johnston's apartment. Johnston then received a telephone call in D'Ambrosio's presence during which D'Ambrosio heard Johnston say "I have the man right here." When Johnston hung up, he said to D'Ambrosio "that's my man Carbone." Johnston told D'Ambrosio that Carbone would be at the apartment between 3 and 3:30 p. m. that afternoon "to deliver the merchandise" and that D'Ambrosio was to call him at 3:30 p. m. At 1:45 p. m., D'Ambrosio left Johnston's apartment and notified Detectives Joseph Nunziata and Octavio Pons, also of the New York Joint Task Force, of the impending delivery of the narcotics at Johnston's apartment.

The area where Johnston resided was placed under surveillance by Nunziata, Pons and others. At 3:30, petitioner Peter Corso, also known as Carbone, arrived by car at Johnston's building and parked nearby. He entered the building, soon emerged and, joined by Johnston, proceeded to a nearby food shop. They returned to Corso's parked car, where Corso opened the trunk of the car and slid a blue Air France travel bag in Johnston's direction. Johnston picked it up and both men proceeded to enter the foyer of Johnston's apartment house. At this point, Detectives Nunziata and Pons arrested the two men and took possession of the bag which contained six half kilogram packages of heroin.

The witnesses called by the prosecutor at the trial included Detectives

---

2. Petitioner also challenged the indictment as duplicitous, but this claim is without substance. *See* United States v. Spada, 331 F.2d 995, 996 (2d Cir.), cert. denied, 379 U.S. 865, 85 S.Ct. 130, 13 L.Ed.2d 67 (1964), and cases cited therein.

D'Ambrosio, Nunziata and Pons, who testified to the foregoing events. Petitioner did not testify, nor did he present any witnesses. This court found the defendant guilty, stating in its findings that the government's "evidence is substantial," as indeed it was.

The judgment of conviction is now challenged upon claims of violation of the constitutional rights already referred to. Nunziata and D'Ambrosio at the trial upon cross-examination denied that there had been any wiretaps in this case. In fact, there had been two unauthorized wiretaps on Johnston's telephone, which both men were aware of at the time of the arrest. In addition, after the arrest but before petitioner's trial it appears that they learned of a third illegal tap, this one on Corso's telephone, placed by a different police unit.

The government contends, however, that petitioner's arrest and conviction are untainted by these three wiretaps—that the information leading to his arrest was derived solely from the undercover negotiations between Detective D'Ambrosio and Johnston (petitioner's codefendant), and the surveillance observation by Nunziata and Pons shortly before and at the time of his arrest. Thus, the hearing was directed to three issues:

(1) whether Corso's arrest and conviction was based upon information obtained through the use of one or more of the illegal wiretaps;

(2) whether the failure of the government to disclose, pretrial, the existence of the wiretaps requires a new trial; and

(3) whether the perjury of government witnesses in denying knowledge of the existence of the wiretaps requires a new trial.

1. *Was petitioner's arrest and conviction tainted by illegal wiretaps?*

Shortly before and at the time of petitioner's arrest, and for some time thereafter, federal, state and local authorities were engaged in criminal investigations which, unknown to one another, pursued at times parallel and at times different lines of investigation. The United States Attorney for this district was engaged in one investigation that was directed towards police corruption in the New York City Police Department. At its center working with the federal authorities as an undercover agent was Robert Leuci, a New York City police detective. The federal investigation was so secretive that in the beginning only two men on the staff of the United States Attorney were aware of it.

At the same time two other investigations were in progress: one by the New York City Joint Task Force, composed of federal, state and New York City enforcement officers, and another by the Special Investigative Unit of the New York City Police Department (SIU). The Joint Task Force focused its activities on Johnston while the SIU was concerned principally with Corso and his son-in-law Bless. Each group worked independently of the other; each on its own engaged in illegal wiretaps. We consider the activities of each in its relationship to this case.

(a) *The New York City Joint Task Force Investigation—the Aguiluz and Nunziata Wiretaps (on Johnston's phone).*

D'Ambrosio and Nunziata, New York City police officers, were members of the Joint Task Force. Carl Aguiluz, also a New York City police officer, was a member of a different unit, the SIU. At the time of the hearing of this motion, Nunziata was dead. Aguiluz testified that early in 1971, following receipt of information from Nunziata that Merritt Johnston was involved in narcotics activities, he placed a wiretap on Johnston's telephone without obtaining a warrant. After Aguiluz reported negative results to Nunziata, the two-week old tap was discontinued. Aguiluz further testified that at no time did he hear the name of Peter Corso or Carbone on the wiretap and it was discontinued at a time long before Detective D'Ambrosio had been introduced to Johnston.

D'Ambrosio testified that about mid-August, 1971, Nunziata told him that he had information on one Merritt Johnston. Soon thereafter D'Ambrosio was introduced to Johnston by an informant and he began his undercover activities with him. Prior thereto he was advised of the unproductive Aguiluz wiretap.

D'Ambrosio knew of another wiretap on Johnston's phone, this one illegally installed by Nunziata before the Aguiluz tap. D'Ambrosio testified that while he knew of the existence of Nunziata's tap, he had never heard any communication taken from it, nor did he have any other knowledge of it. D'Ambrosio admitted that his trial testimony denying knowledge of any wiretaps in this case was false, since he did know of the Aguiluz and Nunziata taps. However, he denied any knowledge of any other taps and specifically said that during his undercover activities with Johnston he was unaware of any other wiretap, legal or illegal, that was in effect. Prior to his September 30 meeting with Johnston he had never heard the name Corso or Carbone.

There was a third wiretap in existence, this one on the telephone of Corso, which we now consider.

(b) *The SIU Tap (on Corso's phone).*

During the period D'Ambrosio was engaged in his undercover negotiations with Johnston, entirely unknown to him and members of his team, the Special Investigative Unit of the New York City Police Department was conducting an independent investigation of Corso and Jack Bless, a suspected narcotics trafficker. This group consisted of Detective Leuci and three others. In late September, Leuci's SIU group placed an illegal wiretap with monitoring and recording equipment on Corso's telephone in an effort to obtain information as to the narcotics activities of Bless and Corso. On October 5, 1971,[3] the SIU group overheard conversations on the wiretap between Corso and Bless about a three kilo narcotics transaction, delivery of which the investigators believed was to be made by Bless to Corso at a barber shop at 69th Street and Madison Avenue. They rushed there to intercept the transaction, but arrived too late. It was at or about that time Corso and Johnston, in possession of three kilos of heroin, were arrested by the Task Force Group.[4]

Leuci and his group were not aware of the activities of the Task Force Group with respect to Johnston and did not learn of Corso's arrest until the evening of October 5th when they intercepted a telephone call from Bless to a female at the Corso apartment. As a result, in an effort to get information about the arrest, Leuci called the Task Force and for the first time was told that Nunziata and his group had arrested Corso earlier that day. Leuci testified that up to that time neither he nor any member of his group had shared any information derived from their illegal wiretap with any member of the Task Force. Indeed Leuci was both surprised and chagrined that his group had been in effect "beaten to the draw" by the Task Force's arrest of Corso earlier that day.

Since there were illegal wiretaps on Corso's phone, during which his two conversations with his co-defendant Johnston were overheard, the burden of

---

3. While there was no testimony as to the date, and the tapes themselves do not reflect the date, the sequence of events referred to herein indicate these conversations took place on October 5, 1971, preceding Corso's arrest. There are also recordings of conversations between Bless and an unknown female in Corso's apartment which indicate they occurred on the same day subsequent to Corso's arrest.

4. On the same day, following a conversation between Corso and Bless (but before the arrest), another conversation was monitored, this one between Corso and Johnston. In it Johnston referred to "three shirts," an expression used in the preceding conversation between Corso and Bless. In the illegal narcotics trade "shirt" is used for a "kilo." It is evident that both monitored conversations related to the sale of the heroin from Johnston to D'Ambrosio. Further, they indicate that Corso was the new "connection" to whom Johnston had referred in his talk with D'Ambrosio on September 30.

proof is upon the government to establish that information derived therefrom was not the basis of Corso's arrest and his subsequent conviction on the narcotics charge.[5] Upon all the evidence I find that the government has sustained its burden of proof. It is clear that the Joint Task Force and the SIU units were conducting separate and independent investigations of suspected narcotics activities and that one group was not disclosing illicitly derived information to the other. In particular, the Corso-Johnston conversation overheard by Leuci and other members of the SIU unit concerning the "three shirts" that Johnston would sell to D'Ambrosio was not revealed to D'Ambrosio or other members of the Joint Task Force until after Corso and Johnston had been arrested. Additionally, the evidence establishes that the only sources of information upon which the arrests were made were: (1) D'Ambrosio's negotiations with Johnston, especially the October 5th conversation when Johnston told him that Carbone would be at the apartment between 3 and 3:30 p. m. to deliver the narcotics; and (2) the surveillance observation thereafter of Corso and Johnston's activities by Nunziata and other members of the Joint Task Force.

2. *Does the failure of the government to disclose, pretrial, the existence of the wiretaps require a new trial?*

Petitioner next contends that the newly discovered evidence of the existence of the illegal wiretaps, even though not the basis of his arrest, requires that the judgment of conviction be vacated and a new trial ordered. He argues that this is compelled because the government suppressed evidence in not disclosing the existence of the wiretaps.

Preliminarily, we consider the appropriate standard under which this claim is to be reviewed. The general standard governing motions for a new trial on the ground of newly discovered evidence is that (1) the evidence must have been discovered after trial, (2) must be material to the factual issues at the trial, (3) not merely cumulative or impeaching, and (4) must be of such a character that it would probably produce a different verdict in the event of a retrial. [6]

Petitioner's burden of proof is significantly reduced where the newly discovered evidence was known to the prosecution at the time of trial but not disclosed.

If the prosecution's nondisclosure was inadvertent or did not involve evidence whose high value to the defense could not have escaped the government's notice, a petitioner is required to show that there is a significant chance that the evidence, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction. [7]

However, where there is deliberate suppression of evidence by the

---

5. Only two reels of wiretapped conversations were in existence at the time of the hearing. Both were derived from the Leuci-SIU tap but only one is material to the instant motion. Originally there were four reels of tape from the Leuci-SIU wiretap. Leuci turned these reels over to a Detective Lamattina who was under investigation by Leuci in connection with police extortion activities based upon the sale of incriminating tapes to persons whose conversations had been overheard. Leuci had made a copy of one of these four reels. The original of this reel and two others were destroyed by Lamattina, who inadvertently discovered that Leuci was engaged in undercover work for the United States Attorney's office. Lamattina failed to destroy the fourth tape which counsel for petitioner agreed was immaterial to this motion.

6. United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); United States v. DeSapio, 456 F.2d 644, 647 (2d Cir.), cert. denied, 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed. 2d 135 (1972); United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969); United States v. Marquez, 363 F.Supp. 802, 805 (S.D. N.Y.1973), aff'd on opinion below, 490 F.2d 1383 (2d Cir.), cert. denied, 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974).

7. United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973); United States v. Mayersohn, 452 F.2d 521, 526 (2d Cir. 1971); United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969).

prosecution, a new trial is required if the evidence is merely favorable or material to the defense.[8] The same rule applies where it appears that the high value to the defense of the undisclosed evidence could not have escaped the prosecutor's attention, even without a demonstration that the evidence was deliberately suppressed.[9] Accordingly, where it appears that the prosecution deliberately suppressed evidence or that the undisclosed evidence is of such high value that it could not have escaped the government's attention, the "materiality" of the evidence to the petitioner is measured by the effect of its nondisclosure upon his trial preparation rather than upon its probable impact upon the jury.[10]

Against this background of applicable law, we consider petitioner's claim with respect to the nondisclosure of the wiretaps. Here a distinction must be borne in mind between the Aguiluz-Nunziata taps and the SIU-Leuci wiretap, and also between the differing roles of those on the prosecution staff. John M. Walker, Jr., Assistant United States Attorney, was in charge of and prosecuted the case against Corso which resulted in his conviction here under attack. As already noted, the investigation by the United States Attorney into alleged corruption in the New York City Police Department was highly secretive, was kept separate and apart from the main work of the United States Attorney's office, and much of its activities were conducted away from his official office to preserve its secrecy. Special Assistant United States Attorney Nicholas Scopetta and Assistant United States Attorney Edward M. Shaw were in charge of the investigation, and Leuci, acting on behalf of the United States Attorney's office in his undercover capacity, reported to them.

First, as to the Aguiluz-Nunziata taps on Johnston's telephone, there is no evidence, not the slightest, that any one in the United States Attorney's office knew of these taps at the time of trial. In the absence of knowledge, direct or imputed, by any member of the prosecution staff of their existence, there can be no claim of deliberate or inadvertent suppression of evidence by the prosecution. Thus, in this instance the issue is whether, had petitioner known of them, it would probably have produced a different verdict. Here the petitioner contends his counsel would have fashioned a different strategy with a reasonable probability of affecting the result. However, applying the more liberal standard favoring motions for a new trial on the ground of newly discovered evidence known to the prosecution but not disclosed through inadvertence, had the existence of these taps been known to the defendant it could in no way have affected the trial outcome.[11] The taps had been removed a month before Corso's arrest. They had been nonproductive and were not in existence at the time of the trial. Perhaps counsel could have attacked the credibility of Nunziata for his illegal wiretapping activity. He also could have cross-examined him and D'Ambrosio to impugn their credibility in view of their sworn denials at the trial.[12] But this collateral

8. Giglio v. United States, 405 U.S. 150, 153–154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. Kahn, 472 F.2d at 287.

9. United States v. Kahn, 472 F.2d at 287; United States v. Polisi, 416 F.2d 573, 576–577 (2d Cir. 1969); United States v. Keogh, 391 F.2d 138, 146–147 (2d Cir. 1968).

10. United States v. Kahn, 472 F.2d at 287; United States v. Polisi, 416 F.2d at 576–577; United States v. Bonanno, 430 F.2d 1060, 1063 (2d Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384 (1970).

11. See United States v. Munchak, 338 F.Supp. 1283, 1293 (S.D.N.Y.1972), aff'd on opinion below, 460 F.2d 1407 (2d Cir.), cert. denied, 409 U.S. 915, 93 S.Ct. 236, 34 L.Ed.2d 177 (1973).

12. If the Assistant United States Attorney knew at the time of trial that a government witness was testifying falsely, his duty was to correct the false testimony. The prosecutor's knowing use of false testimony, even if it only goes to credibility, violates due process. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); United States v. Kaplan, 470 F.2d 100 (7th Cir. 1972), cert.

attack could not overcome the substantial evidence that Corso and Johnston were seen removing the travel bag containing the heroin from Corso's car and that both possessed the heroin at the time of their arrest. All of this was observed by Detective Pons, who corroborated Nunziata. This evidence was most compelling. Thus, knowledge of the Aguiluz-Nunziata taps would not have had the slightest bearing on the issue of petitioner's guilt or innocence. Its use by skilled counsel, whether for trial preparation, trial strategy or impeachment purposes, would have been of inconsequential value in negating the essential elements of the crime.

▮▮▮▮ The SIU-Leuci tap presents a different situation. While Assistant United States Attorney Walker, the trial prosecutor, did not know of this wiretap at the time of trial, Shaw and Scopetta by that time had been informed by Leuci that the SIU had a tap on a relative of Jack Bless. Both Scopetta and Shaw testified at the hearing of this motion that they did not recall whether they had been informed that this relative was Corso or Carbone, the petitioner herein. In any event, they did not associate the tap with Corso, one of the defendants in the federal prosecution, Indeed, they were unaware that any case against him was pending in this court. However, inter-office memoranda with respect to the SIU-Leuci wiretap activities contain Corso's name, address and his alias, Carbone. These were known to Scopetta and Shaw. The record warrants a finding that both were aware that a wiretap had been placed on Corso's phone, but because of the highly secretive nature of their investigation, they did not by the time of trial disclose this to other members of the staff of the United States Attorney, particularly to Walker, the trial prosecutor. The prosecutor's office failed to let "the left hand know what

the right hand is doing." [13] However, despite this lack of communication among members of the prosecution staff, Shaw and Scopetta's knowledge of the SIU-Leuci tap must be attributed to the prosecution as a whole.[14] Since Walker, the trial prosecutor, was unaware of the Corso tap and Shaw and Scopetta were unaware of Corso's prosecution, there is no basis for any claim of deliberate suppression. In this situation, the failure to disclose the existence of the tap was inadvertent. Accordingly, the standard to be applied is whether there is a significant chance that this evidence could have been developed so as to have brought about a different result.[15] Petitioner has failed to satisfy this standard.

The SIU-Leuci tap not only would not have been helpful to petitioner but, to the contrary, would have been most damaging to him, since the conversations that were recorded are incriminating of Corso and Johnston and not exculpatory. If anything, had they been admissible upon the trial they would have corroborated the government's case. At best, as in the instance of the Aguiluz-Nunziata taps, petitioner could have utilized knowledge of this tap for impeachment purposes. But such an attack, even by the most skilled cross-examiner, could not negate the essential facts touching upon the basic issue of petitioner's guilt or innocence. It could not, in the slightest degree, overcome the unimpeached and uncontradicted eyewitness testimony of Detective Pons, who observed D'Ambrosio in his undercover capacity leave Johnston's apartment where the terms of sale and delivery of the heroin had been agreed upon, followed soon thereafter by Corso's appearance upon the scene, then Johnston joining him, and both caught redhanded in possession of the heroin. In sum, knowledge of the existence of the SIU-Leuci wiretap would not have had the slightest effect

denied, 410 U.S. 966, 93 S.Ct. 1443, 35 L.Ed. 2d 701 (1973).

13. Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971).

14. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Santobello

v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); United States ex rel. Rice v. Vincent, 491 F.2d 1326 (2d Cir. 1970).

15. Note 6 *supra*.

upon the court's finding of guilt. Ordinarily the issue is whether the newly discovered evidence could "in any reasonable likelihood have affected the judgment of the jury. . . ." [16] In this instance of a bench trial, greater certitude of judgment can be expressed. Here, it surely would not have made the slightest difference in the result.

3. *Does the perjury of government witnesses in denying knowledge of the wiretaps require a new trial?*

However deplorable it is that Nunziata and D'Ambrosio committed perjury with respect to the wiretaps, as noted above, no basis exists to attribute actual knowledge of such perjury to any member of the staff of the United States Attorney. Indeed, this is acknowledged by petitioner. In the absence of prosecutorial misconduct, and it further appearing that the false testimony is not material to the issue of guilt, there is no basis for granting a new trial.[17]

The motion is denied in all respects.

16. Napue v. Illinois, 360 U.S. 264, 271, 79 S. Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959).

17. *See* Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); United States v. DeSapio, 435 F.2d 272, 286 n. 14 (2d Cir. 1970), cert. denied, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971); United States v. Rosner, 352 F.Supp. 915 (S.D.N.Y. 1974); United States v. Marquez, 363 F. Supp. at 806.