**UNITED STATES of America, Appellee,**

v.

**Frank MOTEN, Defendant-Appellant.**

**No. 208, Docket 79–1226.**

United States Court of Appeals, Second Circuit.

Argued Dec. 19, 1979.

Decided March 24, 1980.

Ivan S. Fisher, New York City (Joel B. Rudin, New York City, of counsel and on ·brief), for appellant.

Robert J. Jossen, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., Richard D. Weinberg, Asst. U. S. Atty., Southern District of New York, New York City, of counsel), for the United States.

Before FRIENDLY, SMITH * and MESKILL, Circuit Judges.

PER CURIAM:

Frank Moten appeals from an order entered in the United States District Court for the Southern District of New York (Richard Owen, *J.*) denying his motion for a new trial and rejecting his request for a continued voir dire of the jury which three years previously had convicted him and sixteen co-defendants of narcotics trafficking. We affirm.

---

* Pursuant to § 0.14 of the Rules of this Court, this appeal is being determined by Judge Friendly and Judge Meskill who are in agreement on this opinion. Judge Smith, who was on the panel that heard oral argument on December 19, 1979, unfortunately died on February 16, 1980. Judge Smith was in agreement with his colleagues on all issues in the case. He did not have the opportunity, however, to see this opinion prior to his death.

## I.

On November 11, 1976, after a fourteen-week jury trial, verdicts were returned finding appellant and his co-defendants guilty of violating federal drug laws. The resulting judgments of conviction were affirmed. *United States v. Moten*, 564 F.2d 620 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977) ("*Moten I*").

During the pendency of his direct appeal, Moten sought to lay the groundwork for a motion for a new trial by seeking the aid of the district court in obtaining certain types of extraordinary discovery relating to his assertion of possible jury prejudice. The application was based upon an incident arising mid-way through the trial involving the attempt by a member of the jury to contact appellant's co-defendant, Sebastian Intersimone, through Intersimone's sister, Yola. This matter was promptly brought to the attention of the trial judge on Monday, September 20, 1976, by Intersimone's attorney, David Keegan, and the Assistant United States Attorney conducting the prosecution. Keegan stated that Ms. Intersimone had informed him that while awaiting his arrival the previous Friday afternoon after court had recessed for the weekend, she had been approached by juror William Keno and asked to arrange a meeting between the juror and defendant Intersimone for the following Monday.

After receiving this information, Judge Owen questioned Ms. Intersimone in his chambers in the presence of Keegan and the prosecutor. Ms. Intersimone confirmed the report, adding that she believed that Keno had been conferring with another individual, whom she could not identify, prior to making his approach. Keno was also examined by the court, and notwithstanding his blanket denial of the story, was discharged from the panel. The transcript of those proceedings was sealed.

The remaining jurors were subsequently informed of the district court's action. With the substantial concurrence of defense counsel, each juror was asked, *in camera*, if he had discussed the case either with Keno or any other member of the jury. After receiving a host of negative responses, the court was satisfied that the panel was untainted, and continued trial. That same day, Monday, September 20, 1976, the government commenced an investigation of the incident pursuant to which Keegan, Ms. Intersimone and Keno all testified before a grand jury. Additionally, Keno was arrested upon a criminal complaint which had been issued on the basis of an affidavit of the Assistant United States Attorney heading the probe into what appeared to be Keno's effort to solicit a bribe. Keno was never indicted and it appears now that the matter has been dropped.

In March, 1977, the district court entertained the aforementioned application for an order granting Moten leave to interview the jurors and requiring the government to divulge various items relevant to the assertion of potential jury prejudice, including the sealed transcript of Judge Owen's *in camera* interviews of Ms. Intersimone and Keno, and the grand jury minutes and other documents relating to the investigation and arrest of Keno. It should be noted that defense counsel had free access to the jury between the date of the verdict and January 31, 1977, when Judge Owen entered an order prohibiting such interrogation without prior court approval, and that Moten had taken advantage of this opportunity.

The motion before Judge Owen was based in large part upon an affidavit of Keegan which averred that Ms. Intersimone had positively recognized the individual with whom Keno had allegedly been conferring prior to his approach as one of two jurors, although she was uncertain which one of the two jurors it had been. Additionally, Moten submitted an affidavit from the forelady of the jury, obtained prior to the court's order prohibiting such activity, stating in pertinent part that Keno had developed a rapport with jurors number 2 and number 8, the two members of the panel suspected by Ms. Intersimone, and that during the course of the trial they had frequently lunched with Keno.

The district court denied the motion *in toto* but this Court reversed, finding "reasonable grounds" to believe that the jury

may have been corrupted. We granted disclosure of the sealed transcripts of the *in camera* interviews of Ms. Intersimone and Keno, remanded for further factual findings with respect to the grand jury minutes and documents relevant to Keno's arrest, and permitted a voir dire of the jury, the scope and manner of which was left to the sound discretion of the district judge. *United States v. Moten*, 582 F.2d 654 (2d Cir. 1978) ("*Moten II*"). In response to the government's motion for a rehearing, this Court refined its mandate to provide for a two-stage proceeding upon remand:

> The inquiry may initially be limited to calling Keno, Ms. Intersimone and [Keegan]. If Keno identifies his companion, then an inquiry of the jurors may become unnecessary. Similarly, if Ms. Intersimone says that her earlier statements about the presence of another individual were false, then the trial judge would have to decide whether Intersimone's prior statements to him, to the grand jury and to [Keegan], standing alone, justify further inquiry. If, as we expect, Keno denies that another person was present or refuses to testify, and if Intersimone adheres to her story that another person was present, then the limited inquiry of jurors that we originally required must be undertaken.

*Moten II, supra*, 582 F.2d at 668.

In accordance with our directive, the various documents held under seal were made available to appellant, and Judge Owen embarked upon the first step of the contemplated proceeding, receiving proof from Ms. Intersimone, Keegan and Keno. The testimony elicited at the hearing was quite unanticipated.

Contrary to her prior inability, either in response to Judge Owen's questioning or before the grand jury, to provide a detailed description of Keno's reputed companion, Ms. Intersimone recalled this individual as a Hispanic male, shorter in stature than Keno, with black hair combed straight back, and wearing a tan suit resembling one worn by juror number 8. Additionally, Ms. Intersimone stated that she could not say with certainty whether this individual had been communicating with Keno prior to Keno's approach. Even more significantly, she testified that she had never told anyone that she had positively recognized the companion as a member of the jury, and indeed, had refused to sign an affidavit to that effect. Ms. Intersimone recollected that she had merely indicated, in response to Keegan's questioning immediately after the incident, that if the universe of suspects was limited to the jury, her suspicions would center entirely on juror number 8.

The next witness, Keegan, retreated from significant averments of the affidavit he had submitted in support of the discovery motion made to the district court. He testified that Yola Intersimone had never stated categorically that the mystery accomplice was a juror, and that her belief that this individual was a member of the panel had only arisen months after the incident. Keegan also conceded that he had never been told that Keno arrived on the scene with another individual, conversed with any person before or after approaching Ms. Intersimone, or departed with another party. He testified that no detailed description of the phantom companion was given him at the time, and recalled, somewhat contrary to Ms. Intersimone's testimony, that she had indicated only that if it were a juror, it could only have been either juror number 2 or juror number 8.

Finally, Keno, testifying under a grant of immunity, conceded that he had conversed with Ms. Intersimone on Friday, September 17, 1976, but maintained that his intentions were innocent, that he was acting alone, and that he had not discussed the incident with other jurors.

In view of this vastly weakened showing of potential jury taint, the government argued that the second stage of the envisaged proceeding—the voir dire of the jury—was now unnecessary, and moved that the hearing be terminated forthwith. Judge Owen determined to examine jurors number 2 and number 8, however, since they were the only jurors fitting Yola Intersimone's belated description. Subsequently, the court itself conducted an examination of these individuals, during which they each denied participation in or knowledge of Keno's activities.

At this point the district court halted the proceedings and denied the motion, finding that there was little evidence to support the claim that Keno was acting in concert with anyone and no evidence to indicate that "any juror had been the person in proximity to Keno at the time of his contact with Ms. Intersimone." Judge Owen stated that there existed "no legitimate basis for interrogating other jurors who are normally entitled to be protected from unwarranted intrusion."

## II.

Appellant claims that the district court flouted the mandate of *Moten II* by failing to complete the voir dire, and by prematurely and incorrectly concluding that the jury was untainted. We disagree.

This Court's prior holding was based upon a factual premise which was undone by the testimony of Ms. Intersimone and Keegan at the remand hearing. Previously, we had believed, on the basis of uncontradicted hearsay statements in the Keegan affidavit, that Ms. Intersimone had identified Keno's alleged companion as a member of the jury, albeit she could not specify, as between jurors number 2 and number 8, which one it was. That notion was wholly discredited by Ms. Intersimone's testimony that she had not, at the time, limited the range of suspects to members of the jury, and by Keegan's concession that his affidavit, in conveying a contrary impression, was erroneous. Quite simply, the factual underpinnings of this Court's prior concern collapsed under the weight of the evidence received at the remand hearing. For the reasons noted above, Judge Owen found little evidence to believe that Keno was acting with another, and no evidence to indicate that if he were, his accomplice was a member of the jury. Those findings are not clearly erroneous.

Appellant has not countered the revelations of the remand hearing. Moten cites the inconsistency in the testimony of jurors number 2 and number 8 concerning the frequency with which they ate lunch with Keno, and further calls our attention to

Keno's eventual admission to having conversed with Yola Intersimone on Friday afternoon, September 17, 1976. From these circumstances he deduces the necessary existence of a conspiracy amongst them. We ascribe no such importance to these matters which are entirely compatible with the district court's finding, and which do not make it any more likely that Keno's approach to Ms. Intersimone was undertaken in concert with another individual.

Nor do we believe in light of the evidence adduced that completion of the voir dire was sufficiently likely to disclose relevant information as to warrant further post-verdict intrusion. Ms. Intersimone testified that the man she had seen with Keno was not necessarily a juror, but that if she had to select a member of that panel as the companion, her suspicions would center exclusively on juror number 8. That individual was examined by Judge Owen and his disavowal of complicity in or knowledge of the scheme was credited by the court. Since the other members of the jury were no longer possible suspects, their testimony, at most, could only provide circumstantial evidence which might inculpate juror number 8. The panel members were not likely to be able to furnish such evidence since some of them had already been interviewed by appellant's counsel prior to the court's January 31, 1977, order prohibiting such contact, and they had even been solicited by Intersimone, apparently without success, after the order had been entered. Moreover, they had already sworn before Judge Owen that they had not discussed the case either with Keno or amongst themselves prior to their deliberations. Accordingly, there was no reason to believe that further inquiry of the jury would reveal anything to substantiate appellant's claim.

In view of the testimony elicited at the remand hearing and appellant's failure to offset that evidence in any significant manner, we hold that the curtailment of the voir dire violated neither the letter nor the spirit of our mandate in *Moten II*. With regard to the former, our directive plainly did not place the district court in a procedural straitjacket; rather, it vested Judge Owen with considerable discretion as to the

mode and extent of the jury inquiry, and by its explicit terms contemplated a voir dire only if Yola Intersimone "adhered to her story," by which we meant the story attributed to her in the Keegan affidavit. This pre-condition was not met.

As to the spirit of our prior opinion, it contained grave misgivings about violating the right of a jury to post-verdict privacy. Our serious reservations were overcome only because of our belief that a substantial showing had been made concerning the likelihood of jury taint. When the factual basis for that belief evaporated, the district court properly presumed that further attempts to impeach the jury's verdict were not justified, and that our mandate had been fulfilled.

The order of the district court is affirmed.