**UNITED STATES of America, Plaintiff,**

**v.**

**Sebastian INTERSIMONE, Defendant.**

**No. 76 Cr. 324.**

United States District Court,
S. D. New York.

April 20, 1981.

---

8. *Guardians Ass'n of the New York City Police, Inc. v. Civil Serv. Comm'n of the City of New* York, 633 F.2d 232, 268 n.67 (2d Cir. 1980).

John S. Martin, Jr., U. S. Atty., U. S. Atty's Office for the Southern District of New York, New York City by Walter P. Loughlin, Asst. U. S. Atty., New York City, for plaintiff.

Sebastian Intersimone, pro se.

## MEMORANDUM AND ORDER

OWEN, District Judge.

In 1976, a jury found seventeen defendants guilty of being members of a far-reaching heroin and cocaine distribution network. The convictions were affirmed on direct appeal, *see, United States v. Moten*, 564 F.2d 620 (2d Cir.), *cert. denied* 434 U.S. 959, 98 S.Ct. 489, 54 L.Ed.2d 318 (1977) ("Moten I"). Today's opinion is yet another chapter in the extensive post-trial history of this case. *See, United States v. Moten*, 582 F.2d 654 (2d Cir. 1978) ("Moten II"); *United States v. Moten*, 620 F.2d 13 (2d Cir. 1980) ("Moten III"). *See generally, In re Grand Jury Subpoena Served Upon Doe*, 551 F.2d 899 (2d Cir. 1977).

While this opinion assumes that the reader is familiar with the foregoing opinions, it is appropriate to observe that they deal mainly with a corrupt trial juror William Keno. At one point during the lengthy trial, Keno corruptly approached and spoke to Yolanda Intersimone, the sister of Sebastian Intersimone, the movant herein, on Broadway, near the Courthouse. The court was promptly informed of the incident, and Keno was immediately discharged. Over the succeeding years, various inquiries have been held and some testimony has been taken on whether another man was with Keno at the time of the corrupt approach, and if so, whether that man was another juror. These inquiries have failed to establish that another juror was with Keno at the critical time.

Against this background of inquiry and appellate review, defendant Intersimone now moves for a new trial. His motion is based on a recent affidavit of his sister, Yolanda Intersimone, and certain assertions on information and belief in his notice of motion. Essentially four grounds are alleged in support of his application: (1) that there was a second man with William Keno at the time of his corrupt approach to Yolanda Intersimone on September 17, 1976 and that beyond question it was juror number eight, Antonio Perez, who thereafter participated in the deliberations resulting in the convictions; (2) that, prior to the trial, Keno had visited a printing establishment and laundromat which were frequented by Intersimone's co-defendant, Frank Moten, had contacted a relative of Moten, named Dudley, before being removed from the jury, and had received a $1500.00 payment from someone before he approached Yolanda Intersimone; (3) that other unspecified members of the jury were offered or were paid bribes; and (4) that the court improperly admitted into evidence a $20,000.00 check issued by the Brunswick Finance Corporation and deposited by Intersimone in his account at the Bankers Trust Company,

which was obtained by Internal Revenue Service ("IRS") Agent Kirchen through the issuance of an IRS Civil subpoena pursuant to 26 U.S.C. § 7602. These allegations, while seeming to warrant a further hearing, upon analysis, do not. For the reasons set forth hereafter the motion is denied in its entirety.

■ Turning to the first ground, the affidavit of Yolanda Intersimone, sworn to before a notary public on April 24, 1980 and declared to be true and correct under penalties of perjury, asserts "beyond a reasonable doubt and to a moral certainty, without any reluctance nor reservation" (sic) that the second man with Keno in front of the Duane Reade drug store on Broadway was juror number eight, Antonio Perez. Clearly, if Keno were, in fact, standing with juror Perez at the time of his corrupt approach to Yolanda Intersimone, the possibility that Perez was in league with Keno would probably necessitate a new trial. However, Ms. Intersimone's present unequivocal words, uttered for the first time some four years after the event, when viewed against her prior utterances, both under oath and otherwise, do not even justify the holding a hearing.

On three prior occasions Ms. Intersimone has testified on this very subject—the identity of the person who may have been with Keno on the Friday afternoon, September 17, 1976. The first two times were on Monday September 20, just three days after the encounter. That morning, Ms. Intersimone was summoned before the Court. At that time, in response to an *in camera* inquiry she said:

> As I was coming out [of Duane Reade drug store] I was very shocked to see one of the jurors standing outside the door, talking to someone. I didn't really notice the man who he was talking to because I was so shocked to see [Keno] right there.

Later that day she was summoned before a grand jury where she testified:

> As I walked out the door [of Duane Reade drug store], who was standing right by the door—one of the jurors [Keno]. He was talking to a man but I did not see who the man was. I just recognized the juror.

Thus, three days after the incident, when her recollection was, or should have been, the freshest, she neither recognized the other man nor could she identify him as a member of the jury, let alone juror number eight.

Next, in March 1977, in the first of the post-trial attacks on the conviction, David Keegan, Intersimone's trial attorney, filed a hearsay affidavit, giving the following as his recollection of a conversation with Ms. Intersimone:[1]

> I had informed the prosecutor Daniel Beller that, according to Ms. Intersimone, juror number 10 was not alone at the time he spoke to her. As I understood it, he had been speaking with another juror,
>
> . . . .
>
> * * * * * *
>
> Ms. Intersimone felt she could not say positively which juror had been with Keno, but she believed that it was one of the Hispanic jurors, either number 2 or number 8. When pressed by me, Ms. Intersimone finally decided she was unable to positively identify the person who had been with Keno and rather than identify the wrong person, she said she could not identify the other person. I reported this to Mr. Beller by telephone and there the matter was dropped.

*Moten II, supra*, at 659. Based solely on this hearsay affidavit, hearings were held in November 1978 and January 1979 on the question of whether another juror was with Keno outside the Duane-Reade drug store. *See Moten II, supra*. However, at that hearing Ms. Intersimone, again under oath, basically failed to support the statements attributed to her by Mr. Keegan and testified as follows:

Q. And what did you see?

---

1. For reasons discussed *infra*, Ms. Intersimone did not file an affidavit in connection with the

proceedings in *Moten II*.

A. I saw two very familiar figures. I saw Juror No. 10 and this other man who was facing him.

\* \* \* \* \* \*

Q. Who was facing you and who was not facing you, or what?

A. Juror No. 10 was facing me. Yes, was facing me as I turned. This man just—all I could see was the back of this other man.

\* \* \* \* \* \*

Q. Did you ever come down and say 'I think it is Juror Number 2 or Juror Number 8?'

A. No.

Q. You said based upon my viewing the back of his head—

A. My suspicions, yes, his overall appearance, yes, but I cannot swear to it because I didn't see the man's face,

Tr. at 31, 70.

\* \* \* \* \* \*

It also came to light at the hearing that in March 1977, that another lawyer for Intersimone[2] had prepared and asked her to sign an affidavit stating that the other person with Keno was either Juror number two or number eight. She refused to sign it, and testified at the subsequent hearing as follows:

Q. So the affidavit which said that you believed it was either Juror Number 2 or Juror Number 8, if you had signed it, would have been false?

A. Yes.

Q. And that was the reason you didn't sign the affidavit?

A. Yes.

Tr. at 74.

Thus, if there had ever been any reason to believe that Ms. Intersimone could identify the other man, such belief was forever dispelled by her testimony in November 1978. Indeed, the same panel of the Court of Appeals that, in *Moten II*, had ordered the hearing at which Ms. Intersimone testified later observed in *Moten III* that:

Previously, we had believed, on the basis of uncontradicted hearsay statements in the Keegan affidavit, that Ms. Intersimone had identified Keno's alleged companion as a member of the jury, albeit she could not specify as between jurors number 2 and number 8, which one it was. That notion was wholly discredited by Ms. Intersimone's testimony that she had not, at the time, limited the range of suspects to the members of the jury, and by Keegan's concession that his affidavit, in conveying a contrary impression, was erroneous. Quite simply, the factual underpinnings of this Court's prior concern collapsed under the weight of the evidence received . . .

*Moten III, supra,* at 16. (emphasis added).

Since all of Ms. Intersimone's prior versions of the events of September 7, 1976, two of them under oath, have stated her inability to identify the second man, her present affidavit, in which she now identifies that man "beyond a reasonable doubt and to a moral certainty" as juror number eight, may be properly regarded as the figment of her brooding imagination. It is also significant, and I take judicial notice of the fact that, Ms. Intersimone was in attendance at virtually every session of the three months trial. Since her brother's conviction, she has made frequent and extensive use of the file room of this courthouse, pouring over the files of this case. Acting as her brother's emissary, she has repeatedly called chambers over the years to inquire as to the status of his various post-trial motions and applications. She sent a lengthy written plea to the court in recent months seeking her brother's release. Given her devotion to her brother and her obvious motivation to assist him in his efforts to terminate the fifteen year prison sentence imposed upon his conviction for selling large quantities of heroin, the most that can be charitably said is that she has become a sad, pliable tool in his hands. While it is distressing, I am compelled to conclude that in her current affidavit Ms. Intersimone has committed rank perjury.

---

**2.** Mr. Keegan's services were terminated after the imposition of sentence on his client.

Under these circumstances, I decline to credit this affidavit and need not make further inquiry into its allegations. *See United States v. Troche,* 213 F.2d 401 (2d Cir. 1954). To do otherwise, over four years after the event and under the circumstances set forth above, would make a mockery of the judicial process.[3]

■ The second ground advanced by Intersimone in support of his motion for a new trial is the unsupported hearsay statement that Keno visited a printing shop and a laundromat frequented by co-defendant Moten and his relatives. Assuming *arguendo* that this is true, Intersimone would still not be entitled to a new trial, because Keno was removed from the jury immediately after the September 17, 1976 incident was uncovered. Moreover, there has never been a scintilla of evidence that any other juror had been tainted by him. Consequently, this information is, at best, cumulative of other evidence of Keno's corruption.

■ Next, the court need pause only briefly at Intersimone's bare allegation that other members of the jury were offered or were paid bribes. On October 29, 1980, the court, in writing, solicited from Intersimone the names of those jurors whom he claimed were tainted as well as some basis for these allegations. *See United States v. Brasco,* 385 F.Supp. 966 (S.D.N.Y.1974) *affirmed* 516 F.2d 816, 819 (2d Cir.) *cert. denied* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). On November 1, 1981, Intersimone wrote the court advising that he would reveal the names of his witnesses and the nature of this evidence only at a hearing on his motion. Such an unsubstantiated allegation in a hearsay affidavit does not warrant an evidentiary hearing. While it is clear that unauthorized private communication with a juror relating to matters pending before

the jury is "presumed to be prejudicial" and that the Government bears the burden of showing that the contact was "harmless to the defendant," *United States v. Brasco, supra,* at 819 *quoting Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), the movant must, as a threshold matter, demonstrate that "reasonable grounds exist to undertake such an investigation." *Moten II, supra,* at 660. Here, Intersimone has declined to make the requisite showing.

Finally, Intersimone seeks a new trial on the ground that the court improperly admitted into evidence a $20,000 check drawn by Peter Fiumara on the account of the Brunswick Finance Corporation which had been deposited by Intersimone into his account with the Bankers Trust Company in Kingston, New York. The check itself came to light after Jack Brown, the pivotal figure in this narcotics conspiracy, surrendered to authorities in early 1975, and disclosed all of the details of the conspiracy to federal agents during intensive debriefing sessions. As to this matter, Brown revealed that Intersimone, with Moten's assistance, "laundered" $20,000 in cash which Intersimone had procured through drug transactions. According to Brown, Moten assisted Intersimone in this effort by arranging for Peter Fiumara, one of Moten's contacts in Boston, to issue a $20,000 check to Intersimone under the guise of a loan.[4]

Sometime after learning from Brown that such a check existed, the Federal Bureau of Investigation ("FBI") ascertained that the Internal Revenue Service ("IRS") had been conducting a tax investigation of Intersimone's tax returns and contacted Special Agent Kirschen, the agent in charge of the investigation. The FBI had him go to the Banker's Trust branch in Kingston to verify that a $20,000 check had been given

---

3. In 1978, in denying Intersimone's motion to intervene in the proceedings on remand in *Moten II,* I observed that Intersimone would have "the benefit of anything discovered by Moten without being precluded from introducing new evidence of [his] own" and that he could "take appropriate action based on any evidence brought out by Moten." *United States v. Moten,* 463 F.Supp. 49 (S.D.N.Y.1978). As ex-

plained at length above, the papers submitted herein add nothing to the record before me in *Moten III* and do not warrant further inquiry.

4. In testimony at trial, Fiumara acknowledged that this "loan" was to a man whom he had never met and that neither principal nor interest had ever been paid on this indebtedness.

to Intersimone by Fiumara and to obtain a microfilm of the check. This Kirschen did, apparently having entree by reason of an IRS civil subpoena issued pursuant to 26 U.S.C. § 7602, which had been served on Banker's Trust on August 1, 1974, a number of months *before* Brown had surrendered to federal authorities. Sometime after having obtained a microfilm of the check, Kirschen sent it to agents in Boston who proceeded to interview Fiumara who furnished them with the original of the check which he later identified at trial.

Today, for the first time, Intersimone urges that the Fiumara *check*, as distinguished from Brown's testimony about the check, should have been suppressed at trial, and that the court's failure to exclude the check necessitates a new trial. In support of this proposition he cites the case of *United States v. La Salle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), in which the Supreme Court refused to enforce an IRS civil subpoena issued solely in aid of a criminal tax investigation, *see also Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971); *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). Intersimone first contends that Agent Kirschen abused the IRS's civil subpoena power when he used a civil subpoena, which had theretofore been properly utilized, to thereafter obtain a check for use in a non-tax related criminal investigation. *Cf. United States v. Shaefer, Michael & Clairton Slag, Inc.*, 637 F.2d 200 (3rd Cir. 1980); *United States v. Serubo*, 604 F.2d 807 (3rd Cir. 1979); *United States v. Chemical Bank*, 593 F.2d 451 (2d Cir. 1979). Next, citing *United States v. Genser*, 582 F.2d 292 (3rd Cir. 1978) for the proposition that the appropriate remedy for such misconduct is the suppression of the evidence at trial, Intersimone argues that because the Fiumara check was not suppressed, he is entitled to a new trial.

■ Because of the untimeliness of Intersimone's motion and his failure to interpose an objection at trial, I need not resolve the question of whether the IRS abused the civil subpoena power in this matter. Inter-simone's motion for a new trial, filed some four years after conviction on the grounds of newly discovered evidence, is untimely. Rule 33 in pertinent part provides:

> A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.

Further, the two year period embodied in Rule 33 is strictly jurisdictional. *See, United States v. Smith*, 331 U.S. 469, 67 S.Ct. 1330, 91 L.Ed. 1616 (1947). *See generally* 2 C. Wright Federal Practice & Procedure § 558 (3rd ed. 1978). *See Corso v. United States*, 389 F.Supp. 659 (S.D.N.Y.1974), affirmed 516 F.2d 896 (2d Cir. 1975).

Construing this *pro se* petition liberally, however, *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972), and deeming these papers as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2255, the application must nevertheless fail. In assessing the merits of Intersimone's claim, I note that

> [n]ot every error of law may be successfully asserted in proceedings under [§ 2255]; the error must be a fundamental one which inherently results in a complete miscarriage of justice. (citations omitted.) Furthermore, where constitutional issues are absent, a defendant who fails to request relief patently available to him on the trial or through regular avenues of appeal may be precluded from subsequently securing it through collateral means.

*United States v. Wright*, 524 F.2d 1100, 1101–02 (2d Cir. 1975). Under the foregoing tests, Intersimone's claim that the IRS abused the "congressionally authorized purpose of 26 U.S.C. § 7602," *United States v. La Salle, supra*, at 308, 98 S.Ct. at 2363, is not cognizable under § 2255.

■ First, an analysis of the role played by the Fiumara check demonstrates that its introduction did not, in any event, result in a "complete miscarriage of justice." *United States v. Wright, supra*, at 1101. The trial of *United States v. Alvarez* lasted

three months during which time the government introduced overwhelming evidence of the existence of an extensive narcotics conspiracy. Brown gave extensive testimony against Intersimone, detailing a relationship with Intersimone involving heroin sales over a number of years; the Fiumara incident was but one minor incident. Thus, Brown testified at trial about the Fiumara transaction, and Fiumara confirmed Brown's story in his testimony. At most, the $20,000 check was corroborative or cumulative. Even assuming *arguendo* that Intersimone could have established a proper basis for excluding the check itself, its admission in no way could have resulted in a "miscarriage of justice."

 Finally, where, as here, Intersimone belatedly challenges the receipt of the check in evidence on essentially statutory grounds, "the rule is well settled that, in the absence of plain error, a timely objection must be interposed to preserve any claim based on the introduction of evidence." *Brawer v. United States*, 462 F.Supp. 739, 745 (S.D.N.Y.1978). *See also United States v. Indiviglio*, 352 F.2d 276 (2d Cir. 1965) (*en banc*), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); *United States v. West*, 494 F.2d 1314 (2d Cir.); *cert. denied*, 419 U.S. 899, 95 S.Ct. 180, 42 L.Ed.2d 144 (1974). Here, the trial transcript reveals that at the time the check was offered, the Government asked Intersimone's counsel to stipulate to the admissibility of the check. In response to the Government's request, counsel objected to the "relevance" of the check but did not assail the IRS's alleged abuse of the civil subpoena power in its procurement.[5]

Mr. KEEGAN: Your Honor, I didn't interpose an objection to the introduction of the check. Mr. Beller had asked me to stipulate to the admissibility of the check, business records rather than call Mr. Fiumara. I want to make my position clear. Those objections interposed to the induction (sic) of testimony by Jack

Brown regarding this transaction as not being relevant to the case on trial. I want to preserve that objection to the relevance of this evidence.

I have no objection to the introduction, the business record foundation. Tr. 5935.

Consequently no objection having been made at trial, Intersimone cannot now raise this alleged statutory violation for the first time over four years later.

Given all the foregoing, Intersimone's motion for a new trial is denied in its entirety.

So ordered.

---

[5]. Intersimone and his counsel were certainly aware of this ground for objection because Moten's counsel had just raised this very objection; as to Moten, the objection had been denied on standing grounds.